**Stanford FORTSON, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 977S662.**

Supreme Court of Indiana.

Feb. 7, 1979.

Rehearing Denied March 26, 1979.

William K. Teeguarden, Terre Haute, for appellant.

Theodore L. Sendak, Atty. Gen., David Michael Wallman, Deputy Atty. Gen., Indianapolis, for appellee.

DeBRULER, Justice.

Appellant was charged and convicted of first degree murder following a trial by jury and sentenced to life imprisonment pursuant to Ind.Code § 35–13–4–1(a). Counsel was appointed to prosecute this appeal and in so doing has presented seven issues:

(1) whether error occurred when the trial court denied appellant's petition for discharge for delay in trial based upon Ind.R. Crim.P. 4;

(2) whether the cumulative effect of several incidents of prosecutor misconduct denied a fair trial;

(3) whether the trial court erred in giving repetitive instructions on the aiding and abetting statute;

(4) whether an instruction regarding the subject of aiding and abetting in the commission of an offense was erroneous;

(5) whether an instruction tendered by the defense on the subject of aiding and abetting was erroneously refused;

(6) whether a new trial should be granted on the basis of newly discovered evidence; and

(7) whether an incriminating statement of appellant was properly admitted.

The body of Ralph Benjamin was found in the trunk of his car on August 24, 1976. The cause of death was a gunshot wound to the head. The car was located in a weedy field in or near the city of Terre Haute. Appellant and his older brother Maurice Fortson together with one Eddie Lewis were returning to Terre Haute from Gary, Indiana on the night of August 24, 1976, when they ran out of gas. They came upon Mr. Benjamin who was parked along the street. Maurice Fortson was armed with a .38 caliber pistol, and the three seized the car. Mr. Benjamin's wallet and watch were taken, and he was locked in the trunk, and the three continued in the car on their way to Terre Haute. Upon arrival there they parked the car in a weedy field. The trunk was opened and Maurice Fortson shot the victim. The three then attempted to remove their fingerprints from the car. Within hours at 8:00 a. m. on the morning of the 24th of August, appellant told his cousin that he had been present during the abduction and killing of Benjamin. Within several days he had told his sister that they had killed Benjamin. The cousin and sister testified to these admissions by appellant. Within a short time after his arrest, appellant gave a statement to the same effect which was admitted in evidence at the trial.

(I)

Appellant was charged on September 22, 1976, and on that same date filed a motion for a trial within seventy days pursuant to the provisions of Ind.R.Crim.P. 4. The trial was originally set for November 29, 1976, a date within the seventy day period; however, that trial date was postponed on motion of the State, and over objection by appellant was reset for trial on a date thirty-three days beyond the seventy day period, namely, on January 3, 1977. Appellant challenged the delay in bringing him to trial by filing a motion for discharge on December 30, 1976, which motion was overruled by the court. Among the allegations in the State's motion for a postponement of the trial and its accompanying memorandum were those calling the court's attention to the congestion of the court's calendar. It made specific mention of ongoing court criminal proceedings and more than a dozen criminal jury trials scheduled for the period between November 29, 1976 and December 31, 1976. Appellant by written motion opposed the continuance on this basis by contending that the alleged congestion was artificial and consisted largely of cases which the State had no intention to try and which had been perennially set and reset for trial. Following argument of counsel the trial court granted the postponement.

Criminal Rule 4(B)(1) expressly provides for an exception to the requirement of discharge for delay in trial beyond the required seventy day limitation, "where there was not sufficient time to try him during such seventy (70) calendar days because of the congestion of the court calendar."

The challenged denial of discharge to appellant was based upon this exception for docket congestion. The fact of reliance by the trial court upon the exception, while not noted in its order, is shown by the content of appellant's motion for discharge which expressly identified the granting of the continuance of the November 29, 1976 trial date as having resulted in the impermissible delay in trial beyond the time limited by the rule. The State's earlier motion for that continuance had in turn been predicated in substantial and sufficient part upon the allegation that the court's docket was overburdened at the time. Such allegation was

sustained by specific supportive statements. There was no error in denying appellant discharge under the terms of the rule.

### (II)

. Appellant cites several instances of prosecutorial misconduct and argues that their cumulative impact served to deny appellant a fair trial. We acknowledged this type of legal claim in *Maldonado v. State*, (1976) 265 Ind. 492, 355 N.E.2d 843, where we said:

> "4. Even if an isolated instance of misconduct does not establish grave peril, if repeated instances evidence a deliberate attempt to improperly prejudice the defendant, a reversal may still result. *Robinson v. State*, (1973) 260 Ind. 517, 297 N.E.2d 409; *Garrett v. State*, (1974) 157 Ind.App. 426, 300 N.E.2d 696." 265 Ind. at 499, 355 N.E.2d at 848.

Appellant contends that during voir dire examination the prosecutor implied that a person could be found guilty as an accessory before the fact by merely being present at the scene of a crime. There is no statement in the record before us from which such implication can fairly be said to have arisen. We, therefore, dismiss this contention from our consideration of this issue. Appellant points to further instances arising during voir dire opening statement and closing argument which include: (1) mention of penalties and suspended sentence under inappropriate circumstances, (2) a statement to a prospective juror that a criminal prosecution is commenced when a judge is convinced that probable cause exists to show that "someone" committed the crime, (3) a statement implying that the rules of evidence to be applied at trial would prevent the jury from hearing all of the evidence, (4) a statement that persons have a legal duty to report crimes to authorities, (5) reference to the evidence supporting a crime not charged, i. e., aiding and abetting in an abduction, (6) a general statement that the jury had heard evidence which had not been contradicted, and (7) reference to the homicide as a "murder" and to the defendant as a "criminal". Objections were made to these instances, which were sustained. Appropriate admonitions requested were given, and motions for mistrial based upon them were overruled.

No deliberate scheme has been shown to have existed here by which the prosecutor sought to improperly prejudice the jury. The mistakes by the prosecutor stemmed for the most part from a lack of preparation. The judge maintained proper control of the proceedings and afforded the defendant with immediate relief from these instances where sought. The prosecutor did not insistently repeat acts of misconduct, once they were brought to his attention. None of the specific instances were of a highly inflammatory nature, and the State's case against appellant was not a weak one, including as it did appellant's own version of his participation in the killing of Mr. Benjamin. We find that the accumulative effect of misconduct by the prosecutor did not deny appellant a fair trial.

Appellant also includes within this issue the claim that the Fourteenth Amendment of the United States Constitution and due process of law required that the court and prosecutor reveal to the jury that the prosecutor had requested a continuance in a co-defendant's case. There was no constitutional error when this matter was not disclosed to the jury as it was not material to the issue of guilt or innocence. *United States v. Agurs*, (1976) 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342.

### (III)

Appellant, relying upon this Court's opinion in *Robbins, Executor et al. v. Fugit*, (1920) 189 Ind. 165, 126 N.E. 321, complains that the court erred in giving four instructions on the subject of aiding and abetting the commission of a felony. In that case we said:

> "When an instruction is once given which fully covers a subject, it should not be repeated. Such needless repetition amounts to an argument on the part of the court and may mislead the jury." 189 Ind. at 168, 126 N.E. at 322.

The first such instruction in the case at bar is primarily the text of the statute. The second placed the legalistic language of the statute in more common parlance; and the third related the subject to the burden of the State to prove guilt beyond a reasonable doubt. The fourth such instruction related the subject to specific example of acts which were open to the jury to consider in determining guilt as an aider and abettor. A discrete legal purpose was served by each of the instructions and we do not believe they would have confused or misled the jury.

### (IV)

Appellant objected to State's Instruction No. 4 which advised the jury:

> "The presence of a person at the scene of the commission of a crime and companionship with another person engaged in the commission of the crime and a course of conduct before and after the offense are circumstances which may be considered in determining whether such person aided and abetted the commission of such crime."

This instruction states the law as it has been pronounced to date. *Schmidt v. State*, (1970) 255 Ind. 443, 265 N.E.2d 219. However, appellant addresses an argument against the instruction which has not heretofore been considered. He contends that the instruction is erroneous in that it "encourages the Jury to consider the accused's conduct after the offense and thus, in effect, allows the State to get a conviction under I.C. 35-1-29-3 (Accessory after the Fact) without ever pleading it." Evidence of conduct after an offense such as first degree murder can be material and relevant to the charge of being an aider and abettor to such offense. The purpose of this instruction is to prevent the jurors from failing to consider such material evidence of guilt upon the erroneous belief that the law prevents it. The instruction is not erroneous on this basis.

### (V)

Appellant tendered the following instruction which was refused by the trial court:

> "No person is criminally liable for the act of another unless he has in advance either authorized or assented to such act."

In order to be guilty as an accessory one must intend by his own actions to cause or facilitate the commission by the principal offender of the crime charged. *Tippitt v. State*, (1977) Ind., 364 N.E.2d 763. He who has provided such knowing assistance is not relieved of criminal responsibility therefore because of the failure of the prosecution to show a prior authorization or assent for the criminal acts of the principal offender. The instruction tendered was not an accurate statement of the law and the rejection of it was not error.

### (VI)

Appellant next contends that the testimony of a co-defendant, Eddie Lewis, unavailable at the time of appellant's trial because Lewis had escaped custody and was at large, and presently available in light of his subsequent recapture and plea of guilty, is newly discovered evidence warranting the grant of a new trial. The legal test to be applied when a claim of this type is raised requires the defendant to establish several elements. Among these is the requirement that the proffered evidence will probably produce a different result if presented on retrial. *Emerson v. State*, (1972) 259 Ind. 399, 287 N.E.2d 867. In making a finding on this element the court "should consider the weight which a reasonable trier of fact would give the proffered evidence in light of all the facts and circumstances shown at the original trial." *Torrence v. State*, (1975) 263 Ind. 202, 328 N.E.2d 214.

Lewis' version of the events culminating in the death of Benjamin, as shown by his trial testimony against Maurice Fortson in a separate trial for this same killing, is in general agreement with the evidence presented to the jury by the prosecution and defense in the trial of appellant. In particular it is in agreement in that it confirms that Maurice Fortson, appellant's old-

er brother, drove the Benjamin car, opened the trunk, and actually shot the victim. Appellant contends that the Lewis testimony would probably produce a different result because it would confirm appellant's statement that he did not want to shoot the victim. It must be acknowledged that that part of Lewis' story would be beneficial to appellant; however, other parts of it would more than offset this benefit by providing damaging circumstantial evidence of appellant's accessoryship. To this purpose it would show that in the presence of appellant Maurice brandished his gun and that it was open and obvious that such gun was loaded. It would also show that in appellant's presence Maurice Fortson closed the trunk lid so as to strike the victim on the head, announced during continuance of the trip to Terre Haute that he was going to kill Benjamin because he was a Pinkerton guard and they are always hitting on people, and drove deliberately on a bumpy road in order to inflict injury upon their captive. The Lewis testimony also showed that appellant, along with Lewis, rifled Benjamin's pockets after he had been shot. It is not probable that the testimony of Lewis would produce a different result if presented on retrial, and therefore the trial court was correct in refusing to grant a new trial on this basis.

### (VII)

Appellant sought suppression of an incriminating statement given by him to the police after he was arrested as a suspect in the killing of Benjamin. In the statement he admitted being one of the trio which had abducted Benjamin, but maintained that he had not fired the fatal shot and had not wanted Benjamin killed. Appellant was a juvenile fifteen years of age. The motion to suppress and an appropriate objection to the introduction of the statement at trial were denied and the statement was given to the jury. His contention identifies two major areas of concern: first, (A) that appellant's mother did not feel well and was emotionally ill at the time she conferred with appellant prior to his waiver of rights and consent to interrogation, and, second,

(B) that an inordinate delay of twenty-nine hours and forty-five minutes occurred from his arrest to the waiver and statement, during which time appellant was not placed in front of a judicial officer.

### A.

At the hearing on appellant's motion and objection, the burden was on the State to establish to the satisfaction of the judge beyond a reasonable doubt that the interrogation of appellant producing the incriminating statement was preceded by a voluntary and intelligent relinquishment of the privilege against self-incrimination and the right to presence and advice of counsel afforded by the Fifth and Sixth Amendments to the United States Constitution, and that the statement itself was voluntarily given. *Miranda v. Arizona*, (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; *Magley v. State*, (1975) 263 Ind. 618, 335 N.E.2d 811; *Burton v. State*, (1973) 260 Ind. 94, 292 N.E.2d 790. Since appellant was a juvenile, fifteen years of age at the time, the State had the further burden of showing that the additional safeguards provided juveniles in this context, namely, that prior to the waiver and statement the juvenile had an actual opportunity to have a meaningful consultation with counsel, parent or other person standing in *loco parentis* to such juvenile prior to the waiver and answering questions. *Lewis v. State*, (1972) 259 Ind. 431, 288 N.E.2d 138; *Burnett v. State*, (1978) Ind., 377 N.E.2d 1340. The State in fulfillment of this obligation presented evidence which showed that appellant gave two statements to police, one on the 9th of September, the day of arrest, within six hours after his arrest; and another on the 10th of September, the day following his arrest and within twenty-nine hours and forty-five minutes of arrest. The evidence shows scrupulous adherence to the requirements of *Miranda* and *Lewis* on each occasion. Only the last of these statements was incriminating and was introduced into evidence and was the subject of the motion to suppress. Prior to each statement, appellant and his mother were given advise-

ments. Both acknowledged understanding of them by initialling each single advisement. After such advisements were given on occasion of each interrogation, mother and son were left alone for as long as fifteen minutes on one occasion in an office for the purpose of discussing whether to give the waiver and answer questions. On both occasions, mother and son signed the waiver form and consent to questioning. On the occasion of the first such waiver, the mother then left the city hall, saying that she did not feel well and was expecting a call from a doctor and was going to have herself committed into Katherine Hamilton Mental Health Center for her nerves. Following her exit appellant gave the police an exculpatory statement which identified others as having committed the crime. According to the testimony, the hour of 3:00 p. m. had arrived and appellant was taken to the county jail and locked up for the night. One of the persons at whom appellant had pointed the accusatory finger in this statement was checked out and found to have no connection with the crime.

The next morning, September 10th, appellant was taken from the jail back to city hall at about 11:00 a. m. where he was again advised of his *Miranda* rights and permitted to consult alone with his mother, and again both signed a waiver of rights and consent to questioning. By 4:30 that afternoon, appellant had confessed his role in the abduction and killing of Benjamin and was returned to the county jail.

In rebuttal to the movant's evidence that appellant's mother was in fact an out-patient at the mental health center, at least at a preliminary stage under counseling by a social worker, the State presented the testimony of the interrogating officers that the mother was nervous and anxious during these two interviews, but that she did not appear ill and was in control of herself and aware of her son's rights and of her surroundings and the consequences of what was happening at the time of the waivers. One officer testified that he had spoken with both mother and son during the period of the past five years and that she had communicated with him in about the same

manner on those occasions and that he could understand her and she him. Both appellant and his mother could read and write. Appellant himself was alert and was aware of what was occurring on both the occasions.

Appellant argues that the appellant's mother was of questionable competency to assist him in choosing whether to relinquish his rights or to answer questions.

■ The Court was faced recently with a similar situation in *Buchanan v. State,* (1978) Ind., 376 N.E.2d 1131, a case in which the father of the juvenile suspect continuously urged his son to tell the truth during consultation and apparently did not discuss the right to counsel or the right to remain silent. The Court held that so long as the father was not acting in concert with the police, his advice would not render the waiver involuntary. There is no evidence at all here that appellant's mother was acting in concert with the interrogating officers to procure her son's waiver and statement. The degree to which the consultation, whether it be with a lawyer or other private person having parental-type duties and responsibilities toward the juvenile, heightens the juvenile's knowledge of his rights and insulates his exercise of judgment from any compulsion from his interrogators, unlike the mandatory requirement that a meaningful opportunity to confer with such persons be afforded the juvenile, is a circumstance among many others which the trial court may consider in arriving at its decision as to whether the waiver is voluntary and knowing. Here we would agree with appellant that the evidence presented of the mother's illness would have weight in opposition to the State's burden to show voluntariness in the total equation as it was being considered by the trial court.

■ For Fifth Amendment purposes, the confinement for twenty-nine hours and forty-five minutes between arrest and the statement does undoubtedly also weigh against the voluntariness of the waiver and statement in the totality of the circum-

stances equation. However, such weight is slight in light of the fact that appellant was taken into custody at a reasonable hour of the morning, permitted to talk alone with his mother within a few hours thereafter, and was not overtly mistreated in any manner. While the mother's illness and the length of detention have an appreciable negative impact, the evidence of the State was substantial and sufficient to warrant the determination of the trial court beyond a reasonable doubt that appellant's relinquishment of rights and subsequent incriminating statement given on September 10th were not procured in violation of appellant's privilege against self-incrimination or right to counsel.

### B.

■ The State concedes that appellant was held for five days before being first taken before a judge. It has been stipulated that appellant was arrested on September 9th, interrogated on the 9th and 10th, and was first taken before a judicial officer on September 14th. Appellant contends that while this period of detention was not unlawful in its inception, it became so by reason of its duration. We agree and find that this unreasonable extended period of detention without presentment is at least sufficient to trigger the constitutional analysis mandated by the United States Supreme Court in *Brown v. Illinois*, (1974) 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416. In *Williams v. State*, (1976) 264 Ind. 664, 348 N.E.2d 623, we construed *Brown* to require suppression where an arrest was made upon probable cause and no presentment was made before a first confession was given sixty-eight hours after arrest and a second confession made ninety-one hours after arrest. In so doing we noted the Fourth Amendment purposes to be served by the *Brown* test and the relevant factors of which that test is primarily comprised:

> " '*Miranda* warnings, and the exclusion of a confession made without them, do not alone, sufficiently deter a Fourth Amendment violation.

Thus, even if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be "sufficiently an act of free will to purge the primary taint." 371 U.S. at 486, 83 S.Ct. at 416. *Wong Sun* thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment.' 95 S.Ct. at 2260–1. (Footnote omitted.)

The Court noted that persons arrested illegally (or, in our case, detained illegally) may decide to confess, as an act of free will unaffected by the initial illegality. And, the determination, whether the confession is the product of free will under *Wong Sun*, is dependent entirely on the facts of the particular case. However, the Court went on to suggest four relevant factors: (1) whether the individual was informed of his rights as required by *Miranda*, (2) the temporal proximity of the arrest and the confession, (3) the presence of intervening circumstances, and (4) 'particularly, the purpose and flagrancy of the official misconduct.' Further, 'the voluntariness of the statement is a threshhold [sic] requirement. And the burden of showing admissibility rests, of course, on the prosecution.' 95 S.Ct. at 2262 (citations and footnotes omitted.)" 264 Ind. at 670–71, 348 N.E.2d at 628.

With regard to the first factor, we have determined already in this opinion that the compliance of the interrogating officers with the requirements of *Miranda* has been demonstrated beyond a reasonable doubt. This factor serves to separate this case from the *Williams* case to a degree in that in *Williams* the version of the *Miranda* advisement was not clear and the circumstances called for further explanation of those rights by the officers. The temporal proximity of the arrest and the second confes-

sion are about the same here as in *Williams* for these purposes in that in both cases the challenged statement was given during a period of detention, unlawful by reason of its extended nature and not by reason of an initial illegal arrest. Unlike *Williams*, however, appellant's first interrogation occurred less than five hours after an arrest, which in the absence of challenge we presume to have been valid, during a period of lawful detention. There were no intervening circumstances shown in *Williams*; however, here the compliance with the requirements of *Lewis* permitting appellant to converse alone with his mother on two occasions during detention for as long as fifteen minutes on one occasion while not a release from custody yet adds a quality of openness to the detention, and permitted appellant to make contact with the world outside. Such contact provides appreciable support for the proposition that appellant's incriminating statement was an independent act of the free will untainted by the detention.

And finally, we consider the purpose and flagrancy of official misconduct. The interrogating officers testified that the court hearing juvenile cases was open only on Tuesdays and Thursdays, and that while they knew other courts in the county had juvenile jurisdiction, juvenile cases as a matter of practice were not heard in those courts. Appellant was arrested between 9:00 a. m. and 10:00 p. m. on Thursday and his first interrogation was complete at 3:00 p. m. The juvenile court was seven or eight miles away and appellant was taken across the street and locked up in the county jail. There was no local practice or statutory requirement requiring the officers to take appellant as a juvenile before a hearing officer or judge for a detention hearing. There was a requirement that the judge authorize detention in the county jail in lieu of detention in a juvenile facility. This is an *ex parte* order and it was procured here on the 10th. Appellant was taken to court on the following Tuesday, the next day scheduled for that court to be open. While none of these factors excuse this unreasonable detention without presentment, they serve to establish that the officers were working within the confines of an extant local court system and that their misconduct was not excessively flagrant.

We find that this case is distinguishable on its facts from *Williams* and that the admission of appellant's incriminating statement was consistent with *Brown v. Illinois, supra.*

The conviction is affirmed.

GIVAN, C. J., and HUNTER, PRENTICE and PIVARNIK, JJ., concur.